# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

OSCAR FELTON,                )
                               )
       Plaintiff,         )
                               )
     vs.                )         Case No. 4:06CV722 CAS(LMB)
                               )
MICHAEL J. ASTRUE,[1]      )
Commissioner of Social Security,   )
                               )
       Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying Oscar Felton's application for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title XVI of the Act.  The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b).  Plaintiff has filed a Brief in Support of Plaintiff's Complaint.  (Document Number 13).  Defendant has filed a Brief in Support of the Answer.  (Doc. No. 14).

## Procedural History

On April 26, 2004, plaintiff filed his application for a Period of Disability, Disability

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration.  On February 12, 2007, Michael J. Astrue became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action. See Fed.R.Civ.P. 25(d)(1).

Insurance Benefits, and Supplemental Security Income, claiming that he became unable to work due to his disabling condition on October 7, 2003. (Tr. 70-72). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated September 14, 2005. (Tr. 57-60, 10-19). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 11, 2006. (Tr. 9, 5-8). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on September 8, 2005. (Tr. 37). Plaintiff was present and was represented by counsel. (Id.). The ALJ began the hearing by admitting the exhibits into evidence. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he was 46 years of age and lived with his sister and aunt. (Tr. 38). Plaintiff stated that he did not have any children under the age of eighteen. (Id.). Plaintiff testified that he was five feet six inches tall and weighed 160 pounds. (Id.). Plaintiff stated that his normal weight was 150 pounds, and that he had gained weight from eating more due to worrying. (Id.).

Plaintiff testified that he receives no source of income, other than food stamps. (Tr. 39). Plaintiff stated that his sister does not work. (Id.). Plaintiff testified that he does not receive Medicaid benefits, although he applied for benefits. (Id.). Plaintiff stated that he completed the eleventh grade and quit school to work. (Tr. 40). Plaintiff testified that he has never had a driver's license. (Id.). Plaintiff stated that he takes the bus for transportation and he does not

have difficulty doing so. (Id.).

Plaintiff testified that his last job was working at Saint Louis University as a floor buffer. (Id.). Plaintiff stated that he last worked October 7, 2003. (Id.). Plaintiff testified that he stopped working at that time because he experienced muscle spasms, after which he was fired. (Tr. 41). Plaintiff stated that he would need stronger medicine to return to work as a buffer due to the pain he experiences. (Id.).

Plaintiff testified that he has also worked as a porter, dishwasher, and janitor in the past fifteen years. (Id.). Plaintiff stated that he is not able to return to any of these jobs due to his impairments. (Id.).

Plaintiff testified that he applied for unemployment after he was fired from Saint Louis University and was denied. (Tr. 42). Plaintiff stated that he did not believe he was capable of working but applied for benefits because he thought he was improperly fired. (Id.).

Plaintiff testified that he experiences back spasms, back pain, and neck pain. (Id.). Plaintiff stated that he experiences pain in his lower back and his neck constantly. (Id.). Plaintiff testified that his pain is relieved by muscle relaxers and pain medication, especially Ultracet.[2] (Id.). Plaintiff stated that the Ultracet relieves his pain and makes him tired. (Tr. 43).

Plaintiff testified that he underwent surgery in late 2003 to remove a bone from his hip and place it in his neck. (Id.). Plaintiff stated that his doctors performed this surgery to relieve his pain, although he still experiences pain. (Id.). Plaintiff testified that he has told his doctors that he still has pain but they have not made a decision regarding treatment. (Id.). Plaintiff stated that

---

[2]Ultracet is indicated for short-term (five days or less) management of acute pain. See Physician's Desk Reference (PDR), 2509 (57th Ed. 2003).

he has not told his doctors that his pain medication makes him too tired. (Tr. 44).

Plaintiff rated the back and neck pain he experiences daily as a nine on a scale of one to ten without medication. (Id.). Plaintiff rated his neck pain as a ten. (Id.). Plaintiff testified that he has a clamp in his neck to hold the bone together. (Id.). Plaintiff stated that his doctors have told him that the neck and back pain he experiences is caused by the surgery. (Id.). Plaintiff explained that he underwent surgery due to a work-related injury he sustained. (Id.).

Plaintiff testified that he still sees doctors for his pain. (Tr. 45). Plaintiff stated that he did not take his medication prior to the hearing because it causes him to fall asleep. (Id.). Plaintiff testified that he was experiencing pain during the hearing in his back and neck. (Id.).

Plaintiff testified that he has not been hospitalized since undergoing his discectomy.[3] (Id.). Plaintiff stated that he does not see a psychiatrist and that he does not believe he should see a psychiatrist. (Id.).

Plaintiff testified that he does not sleep well at night. (Id.). Plaintiff stated that he tosses and turns at night because he sleeps on a hard couch at his sister's house. (Tr. 46). Plaintiff testified that he lives with his sister because he cannot afford to live on his own. (Id.). Plaintiff stated that he lived on his own when he worked. (Id.). Plaintiff testified that he takes two-hour naps during the day. (Id.).

Plaintiff testified that he does not have any difficulty taking care of his personal hygiene. (Id.). Plaintiff stated that he does not do any housework due to his lower back and shoulder pain. (Tr. 47). Plaintiff testified that he occasionally cooks meals such as eggs and bacon, and that he

---

[3]Excision, in part or whole, of an intervertebral disk. Stedman's Medical Dictionary, 508 (27th Ed. 2000).

does not have any difficulty doing this. (Id.). Plaintiff stated that he uses light-weight pans, which weigh about five pounds. (Id.). Plaintiff testified that he does not believe he can lift more than five pounds. (Id.). Plaintiff stated that he shops for groceries about once a month. (Tr. 48). Plaintiff testified that he does not buy many items when he shops due to his lack of finances. (Id.). Plaintiff stated that he is able to carry the groceries back to his house if they are light. (Id.).

Plaintiff testified that on a typical day he takes naps and watches televison. (Id.). Plaintiff stated that he does not have any hobbies. (Id.). Plaintiff testified that he used to enjoy working and he would return to work if he was physically capable of working. (Tr. 48-49). Plaintiff stated that he does not belong to any clubs or organizations and he does not attend church. (Tr. 49). Plaintiff testified that if he were not at the hearing he would be lying down. (Id.). Plaintiff stated that he does not visit with any friends, although he visits his five sisters. (Id.). Plaintiff testified that when he visits his sisters they sit and talk for about an hour. (Id.). Plaintiff stated that he also lies down on the couch when visiting his sisters. (Tr. 50).

Plaintiff testified that the longest amount of time he can sit is about an hour. (Id.). Plaintiff stated that after an hour, he would have to move due to his back pain. (Id.). Plaintiff testified that he can only stand about less than an hour due to his back pain. (Id.). Plaintiff stated that he walks twice a week for about a mile for exercise and to think. (Tr. 51). Plaintiff testified that he has aches in his back after walking for a mile. (Id.). Plaintiff stated that he experiences pain in his back and legs when he bends. (Id.).

Plaintiff testified that he filed a workers' compensation claim after he was injured at work. (Id.). Plaintiff stated that his workers' compensation claim settled for $23,000 in August of 2005, and that he received $16,000 from the settlement. (Tr. 52). Plaintiff testified that he did not

receive temporary weekly benefits prior to his settlement. (Id.).

**B.** **Relevant Medical Records**

Plaintiff's school records reveal that plaintiff's most recent IQ score was 67, in October of 1972, when he was thirteen years of age. (Tr. 116). Previous IQ tests revealed scores of 76, 75, 81, and 78.[4] (Id.).

Plaintiff was admitted to Forest Park Hospital on October 16, 2002, through October 18, 2002, for treatment of gallstones.[5] (Tr. 134). Plaintiff was originally scheduled for a laproscopic cholecystectomy[6] but it was converted to an open cholecystetomy due to the size of one of the stones that disrupted the gallbladder. (Tr. 125). Plaintiff's final diagnosis was acute and chronic cholecystitis[7] and cholelinthiasis.[8] (Id.).

Plaintiff presented to the emergency room at Forest Park Hospital on September 17, 2003, with complaints of chest, neck, back, and right arm pain. (Tr. 140). Plaintiff was diagnosed with cervical[9] radiculopathy[10] and was prescribed Naproxen[11] and Flexeril.[12] (Tr. 137, 144).

_____

[4]An IQ range of 71-84 denotes Borderline Intellectual Functioning, whereas an IQ of 70 and below denotes Mental Retardation. Diagnostic and Statistical Manual of Mental Disorders 45 (4th Ed. 1994) ("DSM IV").

[5]A concretion in the gallbladder or a bile duct, composed chiefly of a mixture of cholesterol and calcium. See Stedman's at 724.

[6]Surgical removal of the gallbladder. Stedman's at 337.

[7]Inflammation of the gallbladder. Stedman's at 337.

[8]Presence of concretions in the gallbladder or bile ducts. Stedman's at 339.

[9]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information

Plaintiff underwent physical therapy for his right shoulder blade, neck, and right arm pain from October 6, 2003, through October 17, 2003. (Tr. 145-51). It was noted that plaintiff's pain began on September 13, 2003, due to an injury he sustained at work. (Tr. 145). Plaintiff reported feeling good while in therapy, yet experiencing increased pain afterwards. (Tr. 149). Plaintiff rated his pain as an eight on a scale of one to ten on October 17, 2003. (Tr. 151).

Plaintiff saw Thomas J. Fox, M.D., on October 23, 2003, with complaints of right neck and right shoulder pain over the past two months. (Tr. 220). Upon physical examination, Dr. Fox found that plaintiff exhibited full range of motion of the neck and shoulder. (Id.). X-rays revealed well-aligned cervical vertebrae without evidence of narrowing in the disk space; and arthritic changes in the shoulder. (Id.). Dr. Fox's impression was right shoulder impingement syndrome with some reported numbness in the right upper extremity. (Id.). Dr. Fox administered a steroid injection in the shoulder. (Tr. 221).

Plaintiff underwent a nerve conduction study on December 1, 2003, which revealed electrical evidence of a right C6-C7 cervical radiculopathy or other intraspinal canal process. (Tr. 152-53).

Plaintiff underwent an MRI of the cervical spine on December 6, 2003, which revealed

_____

Systems for Lawyers, § 6:27 (1993).

[10]Disorder of the spinal nerve roots. Stedman's at 1503.

[11]Naproxen is indicated for the treatment of pain associated with arthritis and osteoarthritis. See PDR at 2892.

[12]Flexeril is indicated for relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1897.

evidence of cervical spondylosis[13] with protrusion and possible small extrusion at C5-6. (Tr. 157).

Plaintiff presented to Lukasz J. Curylo, M.D. for a consultation on December 30, 2003. (Tr. 166-67). Upon physical examination, plaintiff had decreased sensation to light touch and pinprick in the C6 bilaterally, left worse than the right. (Tr. 166). Plaintiff also exhibited poor coordination of his hands, right worse than the left. (Id.). Dr. Curylo's diagnosis was C6 bilateral radiculopathy sensory, cervical stenosis[14] with early findings of cervical myelopathy,[15] cervical disc herniation superimposed on cervical stenosis at C5-6, and mild degenerative disc disease[16] at C3-4 and C4-5. (Tr. 167). Dr. Curylo noted that plaintiff had gone through extensive conservative therapy for the prior three months, continues to have sensory deficits, and has failed injections, traction, and medications. (Id.). Dr. Curylo expressed the opinion that plaintiff had exhausted all conservative treatment options and could either continue as is or undergo an anterior cervical discectomy and fusion. (Id.). Dr. Curylo indicated that plaintiff decided to proceed with surgery. (Id.).

On January 7, 2004, plaintiff underwent anterior cervical discectomy and decompression of the spinal cord; anterior cervical fusion of C5 to C6; anterior cervical instrumentation using a

---

[13]Stiffening of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. Stedman's at 1678.

[14]Narrowing of the spinal canal. See Stedman's at 1695.

[15]Disorder of the spinal cord. Stedman's at 1171.

[16]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. Medical Information Systems for Lawyers, § 6:201.

plate; and left iliac crest[17] bone graft through a separate skin incision. (Tr. 178). Dr. Curylo indicated that postoperatively, plaintiff was neurologically intact, ambulating well, and his wound was healing well. (Tr. 173). Plaintiff was given Percocet[18] upon discharge. (Id.). His final diagnosis was C5-6 anterior cervical disc herniation. (Id.).

Plaintiff presented to the emergency room at St. Mary's Health Center on January 10, 2004, with complaints of chest pain. (Tr. 154). Plaintiff indicated that the pain began the night after his surgery. (Id.). Plaintiff underwent an EKG, which was normal. (Tr. 162). Plaintiff was diagnosed with atypical chest pain and cellulitis.[19] (Tr. 160).

Plaintiff presented to Dr. Curylo for a two-week surgical follow-up on January 20, 2004. (Tr. 169). Plaintiff reported that his numbness had completely resolved since the surgery. (Id.). Plaintiff had no weakness. (Id.). Plaintiff did report some slight pain around the neck and right shoulder, but indicated that overall he was very satisfied with the early results of the surgery. (Id.). Upon examination, plaintiff had full strength throughout his upper and lower extremities with intact sensation to light touch and pinprick. (Id.). Dr. Curylo's impression was excellent short-term result after anterior cervical discectomy, recovering well with some residual symptoms of neck pain. (Id.). Dr. Curylo continued plaintiff with the collar for another four weeks. (Id.).

On February 24, 2004, plaintiff indicated that he was satisfied with the results, although he still reported some slight residual neck pain and some slight graft donor sight pain. (Tr. 170).

---

[17]The long, curved upper border of the wing of the ilium, which is the broad, flaring portion of the hip bone. See Stedman's at 875, 424.

[18]Percocet is indicated for the relief of moderate to moderately severe pain. See PDR at 1304.

[19]Inflammation of loose, connective tissue beneath the skin. See Stedman's at 317.

Plaintiff indicated that he took one Percocet at night for his pain. (Id.). Upon physical examination, plaintiff had full motor strength throughout, intact sensation to light touch and pinprick, and no pain with range of motion of his neck. (Id.). X-rays revealed a healed cervical fusion with no gross motion. (Id.). Dr. Curylo's impression was status post a cervical discectomy with good to excellent result with some residual axial neck pain. (Id.). Dr. Curylo discontinued the collar, discontinued the Percocet, and prescribed a low-dosage of Vicodin.[20] (Id.).

Plaintiff saw Dr. Curylo for a follow-up on May 11, 2004, at which time plaintiff reported that all of his arm symptoms of pain, numbness, and tingling had resolved. (Tr. 171). Plaintiff continued to report some axial neck pain, which was relieved with ibuprofen. (Id.). Plaintiff also complained of some soreness at his iliac crest graft site. (Id.). Upon physical examination, plaintiff had full motor strength, his incisions were healed, and intact sensation to light touch and pinprick. (Id.). X-rays revealed a well-appearing fusion. (Id.). Dr. Curylo's impression was: healed anterior cervical discectomy fusion with resolution of radiculopathy with some axial neck pain; patient has had some improvement since the last visit. (Id.). Dr. Curylo started plaintiff on physical therapy with range of motion isometrics, and continued the ibuprofen on an as-needed basis. (Id.).

Plaintiff saw Dr. Curylo for a follow-up on August 3, 2004. (Tr. 210). Plaintiff complained of axial neck pain, which was relieved only partially with ibuprofen. (Id.). Plaintiff had no weakness or numbness and overall was satisfied. (Id.). Upon physical examination,

---

[20]Vicodin is indicated for the relief of moderate to moderately severe pain. See PDR at 509.

plaintiff exhibited full motor strength, intact sensation to light touch and pinprick, and full range of motion of his cervical spine with pain at the extremes. (Id.).

Plaintiff presented to Robert P. Poetz, D.O., for an evaluation of work-related injuries on September 29, 2004. (Tr. 228-33). Dr. Poetz expressed the opinion that plaintiff had a five percent permanent partial disability to the body as a whole at the cervical spine, pre-existing; a forty percent permanent partial disability to the body as a whole at the cervical spine, directly resultant from the September 17, 2003 work-related injury; and a twenty percent permanent partial disability to the left upper extremity at the left hand, pre-existing. (Tr. 232).

Plaintiff presented to Saint Louis ConnectCare on June 13, 2005, with complaints of neck and back pain since his back surgery. (Tr. 194). Plaintiff was prescribed ibuprofen and Flexeril. (Tr. 195).

Plaintiff saw a neurologist at Saint Louis ConnectCare on July 25, 2005, with complaints of pain in his back, neck, and shoulders, and coldness/numbness in both legs. (Tr. 198). Upon physical examination, plaintiff had decreased pinprick sensation on the left side of the face and decreased pinprick sensation and fine touch in the left upper extremity to the elbow and in the right lower extremity bilaterally to the toes/ankle. (Tr. 200). Plaintiff had decreased balance and he was unable to walk on his heels. (Id.). Plaintiff was unable to bend backward, was limited to 45 percent forward bending, with back muscle spasm at L4-L5. (Tr. 201). The assessment of the neurologist was: right trapezius muscle[21] spasm and spasm of the right lumbar muscles, as well as tension headaches. (Tr. 202). The neurologist noted that plaintiff's sensory loss is consistent with a functional deficit and is unlikely to represent a lumbar radiculopathy. (Id.). The

---

[21]Extrinsic muscle of the shoulder. Stedman's at 1158.

neurologist stated that plaintiff's back shows limited range of motion on extension but not on side to side movements.  (Id.).  Plaintiff was prescribed Ultracet for pain and Carisoprodol[22] for muscle spasm.  (Id.).

## C.    Evidence Submitted to Appeals Council[23]

Dr. Curylo completed a Physical Residual Functional Capacity Questionnaire on November 28, 2005.  (Tr. 250-54).  Dr. Curylo indicated that he had been treating plaintiff since December of 2003, and that he diagnosed plaintiff with cervical stenosis of the spine, with numbness and pain.  (Tr. 250).  Dr. Curylo indicated that plaintiff was not a malingerer, plaintiff's impairments are reasonably consistent with the symptoms and functional limitations described in his evaluation, plaintiff's experience of pain or other symptoms are severe enough to frequently interfere with attention and concentration needed to perform even simple work tasks, and his impairments are expected to last at least twelve months.  (Tr. 250-51).  Dr. Curylo expressed the opinion that plaintiff is capable of sitting thirty minutes at one time, standing thirty minutes at one time, sitting a total of about four hours in an eight-hour workday, and standing a total of less than two hours in an eight-hour workday.  (Tr. 251-52).  Dr. Curylo also found that plaintiff needs to walk around every thirty minutes for a period of ten minutes during a workday, needs a job that

---

[22]Carisoprodol is indicated for the relief of discomfort associated with acute, painful musculoskeletal conditions.  See PDR at 3254.

[23]The following records were not submitted to the ALJ but were submitted to and considered by the Appeals Council.  (Tr. 248-54).  As such, this court will determine whether the record as a whole, including the new evidence, supports the ALJ's determination.  See Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994) (where the Appeals Council considers new evidence and declines review, it is not the place of the courts to evaluate the decision to deny review, but rather it is the role of the courts to determine whether the record as a whole, including the new evidence, supports the ALJ's determination).

permits shifting positions at will, and needs to take unscheduled breaks during an eight-hour workday three to four times a day for ten to twenty minute periods. (Tr. 252). Dr. Curylo found that plaintiff could frequently lift up to ten pounds, occasionally lift twenty pounds, and never lift fifty pounds. (Id.). He indicated that plaintiff could rarely look down or look up, and occasionally turn his head right or left; never climb ladders, and occasionally twist, stoop, crouch/squat, or climb stairs. (Tr. 253). Dr. Curylo noted that plaintiff had significant limitations with reaching, handling, or fingering. (Id.). He indicated that plaintiff could grasp, turn or twist objects with his hands eighty percent of the time during a working day; manipulate with his fingers eighty percent of the time during a working day; and reach, including overhead, with his arms a total of ten percent of the time during a working day. (Id.). Dr. Curylo estimated that plaintiff would likely be absent from work as a result of his impairments an average of four days per month. (Id.). Dr. Curylo also noted that plaintiff should avoid humidity, wetness, and cold work conditions. (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1. The claimant met the special earnings requirements of the Act as of September 7, 2003, the alleged onset date of disability, and continues to meet them through the date of this decision.

2. The claimant possibly has not engaged in substantial activity since September 7, 2003, but he did do some work for pay and profit until at least the second quarter of 2004.

3. The medical evidence establishes that the claimant has status-post anterior discectomy and fusion at C5-C6 and probable borderline intellectual functioning, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

4.      The claimant's allegation and that of his sister of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity are not credible, for the reasons set out in the body of this decision.

5.      The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except probably for lifting or carrying more than 25 pounds frequently or more than 50 pounds occasionally, or doing more than simple, repetitive tasks (20 CFR 404.1545 and 416.945).

6.      The claimant's past relevant work as a janitor/cleaner did not require the performance of work-related activities precluded by the limitations described in Finding No. 5 (20 CFR 404.1565).

7.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 18-19).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the applications filed on April 26, 2004, the claimant is not entitled to a period of disability or to disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act; and is not eligible for supplemental security income under Sections 1602 and 1614(a)(3)(A) of the Act.

(Tr. 19).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion. See <u>Kelley v.</u> <u>Callahan</u>, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." <u>Id.</u>

## B.    <u>The Determination of Disability</u>

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See <u>Ingram v. Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); <u>Fines v. Apfel</u>, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-

related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.      Plaintiff's Claims**

Plaintiff raises two claims on appeal of the decision of the Commissioner. Plaintiff first argues that the ALJ erred in assessing plaintiff's residual functional capacity. Plaintiff next argues that the ALJ erred in failing to obtain vocational expert testimony. The undersigned will discuss plaintiff's claims in turn.

**1.      Residual Functional Capacity**

Plaintiff argues that the ALJ erred in assessing his residual functional capacity. Specifically, plaintiff contends that there is no medical evidence in the record that supports the ALJ's conclusion that plaintiff is capable of performing medium work. Plaintiff also contends that the ALJ erred in failing to develop the record regarding plaintiff's suspected borderline intellectual functioning.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the

workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

It is true that the ALJ has a duty to fully develop the record, particularly where a claimant is not represented by counsel. See Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981). This inquiry, however, is limited to whether the claimant was prejudiced or unfairly treated by the ALJ's development of the record. See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). "An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1999) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)). Further, no error exists where there is substantial medical evidence in the record, particularly by treating source physicians, which strongly supports an ALJ's decision. See Isaacs v. Barnhart, 196 F. Supp.2d 934, 942 (D. Neb. 2001) (citing Haley 258 F.3d at 749-750).

The ALJ concluded as follows:

[t]he claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except probably for lifting or carrying more than 25 pounds frequently or more than 50 pounds occasionally, or doing more than simple, repetitive tasks (20 CFR 404.1545 and 416.945).

(Tr. 19).

In the instant case, the undersigned finds that the ALJ's assessment of residual functional capacity is not supported by substantial evidence. The ALJ found that plaintiff was capable of

- 19 -

performing medium work, with the additional limitation of only simple, repetitive tasks. (Tr. 19). The ALJ did not provide any medical support for his assessment, but rather stated that he found "no persuasive medical reason" why plaintiff could not perform medium work. (Tr. 16). In fact, no physician, treating or otherwise, had expressed an opinion regarding plaintiff's ability to function in the workplace at the time the ALJ rendered his decision.

With regard to plaintiff's back impairment, the medical evidence presented to the ALJ reveals that plaintiff underwent an anterior discectomy and fusion at C5-C6 on January 7, 2004. (Tr. 178). Dr. Curylo's treatment notes indicate that plaintiff was satisfied with the results immediately following surgery, although he continued to complain of slight pain around the neck and shoulder. (Tr. 169, 170). On June 13, 2005, plaintiff presented to Saint Louis ConnectCare with complaints of neck and back pain since his surgery. (Tr. 194). Plaintiff was prescribed Flexeril at this time. (Tr. 195). Plaintiff saw a neurologist at Saint Louis ConnectCare on July 25, 2005, with complaints of pain in his back, neck, and shoulders, and coldness/numbness in both legs. (Tr. 198). Plaintiff was diagnosed with right trapezius muscle spasm and spasm of the right lumbar muscles and was prescribed Ultracet and Carispradol. (Tr. 202). Thus, the medical evidence presented to the ALJ is supportive of pain and restrictions due to plaintiff's spine impairment.

In addition, Dr. Curylo completed a Physical Residual Functional Capacity Questionnaire on November 28, 2005, which plaintiff submitted to the Appeals Council. (Tr. 250-54). Dr. Curylo indicated that he had been treating plaintiff since December of 2003, and that he diagnosed plaintiff with cervical stenosis of the spine, with numbness and pain. (Tr. 250). Dr. Curylo expressed the opinion that plaintiff is capable of sitting thirty minutes at one time, standing thirty

minutes at one time, sitting a total of about four hours in an eight-hour workday, and standing a total of less than two hours in an eight-hour workday. (Tr. 251-52). Dr. Curylo also found that plaintiff needs to walk around during a workday, needs a job that permits shifting positions at will, and needs to take unscheduled breaks during an eight-hour workday three to four times a day for ten to twenty minute periods. (Tr. 252). Dr. Curylo found that plaintiff could frequently lift up to ten pounds, occasionally lift twenty pounds, and never lift fifty pounds. (Id.). He indicated that plaintiff could rarely look down or look up, and occasionally turn his head right or left; never climb ladders, and occasionally twist, stoop, crouch/squat, or climb stairs. (Tr. 253). Dr. Curylo noted that plaintiff had significant limitations with reaching, handling, or fingering. (Id.). Dr. Curylo estimated that plaintiff would likely be absent from work as a result of his impairments an average of four days per month. (Id.). Dr. Curylo also noted that plaintiff should avoid humidity, wetness, and cold work conditions. (Id.).

Dr. Curylo's opinion regarding plaintiff's functional limitations is much more restrictive than that of the ALJ and is inconsistent with the ability to perform medium work. The opinion of Dr. Curylo, plaintiff's treating physician since 2003, is entitled to significant weight. See Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) ("[o]rdinarily, a treating physician's opinion should be given substantial weight.") (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Dr. Curylo completed his residual functional capacity assessment after the ALJ rendered his decision, yet he indicated that he had been treating plaintiff since December of 2003. (Tr. 250). As such, it is unclear whether Dr. Curylo's assessment applies to plaintiff's condition at the time of the hearing.

The ALJ also found that plaintiff "possibly" had a limitation to simple, repetitive tasks

because of "suspected borderline intellectual functioning."[24] (Tr. 16). Plaintiff was assessed with

having an IQ of 67 by the St. Louis Public Schools.[25] This IQ test was administered in 1972,

when plaintiff was thirteen years of age. As such, the record is supportive of not only borderline

intellectual functioning, but also mental retardation. There is no recent evaluation of plaintiff's

intellectual functioning in the record. If the ALJ felt that plaintiff's IQ scores were insufficient to

meet Listing 12.05,[26] then he had a duty to further develop the record by ordering a consultative

examination.

---

[24]Borderline Intellectual Functioning is defined by an IQ score that is higher than that for
Mental Retardation, generally 71-84. See DSM IV at 45.

[25]An IQ range from 50-55 to approximately 70 denotes "Mild Mental Retardation."
Individuals with this level of mental retardation:

> [T]ypically develop social and communication skills during the preschool years (ages 0-5
> years), have minimal impairment in sensorimotor areas, and often are not distinguishable
> from children without Mental Retardation until a later age. By their late teens, they can
> acquire academic skills up to approximately the sixth-grade level. During their adult
> years, they usually can achieve social and vocational skills adequate for minimum self-
> support, but may need supervision, guidance, and assistance, especially when under
> unusual social or economic stress. With appropriate supports, individuals with Mild
> Mental Retardation can usually live successfully in the community, either independently
> or in supervised settings.

DSM IV at 41.

[26]12.05 *Mental Retardation*: Mental retardation refers to significantly subaverage general
intellectual functioning with deficits in adaptive functioning initially manifested during the
developmental period; i.e., the evidence demonstrates or supports onset of the impairment before
age 22.

> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied.
> ***
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical
> or other mental impairment imposing an additional and significant work-related
> limitation of function;

20 C.F.R. pt. 404, subpt. P, App. 1 at 472 (emphasis in original).

In sum, the residual functional capacity formulated by the ALJ is not supported by substantial evidence. At the time the ALJ issued his decision, there was no evidence regarding plaintiff's functional limitations. The medical evidence presented to the ALJ was supportive of pain and limitations due to plaintiff's back impairment, and plaintiff's IQ scores were supportive of borderline intellectual functioning or mental retardation. As such, the ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace. Accordingly, the undersigned will recommend that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new residual functional capacity for plaintiff, based on the medical evidence in the record, and to order additional medical information addressing plaintiff's ability to function in the workplace.

**2.      Lack of Vocational Expert Testimony**

Plaintiff argues that the ALJ erred by using the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because plaintiff has significant non-exertional impairments. Specifically, plaintiff argues that plaintiff suffers from borderline intellectual functioning and pain. Plaintiff contends that the ALJ's use of the Medical-Vocational Guidelines, commonly known as the "Grids," to determine that plaintiff was capable of performing other work, was error. Plaintiff argues that once a non-exertional impairment is shown to exist, vocational expert testimony is required.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this

burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based
generalization[s] about the availability of jobs for people of varying ages, educational
backgrounds, and previous work experience, with differing degrees of exertional impairment."
Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999) (quotation omitted). Use of the guidelines is
permissible only if the claimant's characteristics match those contained in grids and only if the
claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 26
(8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability
of jobs to people whose impairments are nonexertional, and who therefore cannot perform the full
range of work contemplated within each table." Id. Accordingly, the Eighth Circuit requires "the
Commissioner [to] meet his burden of proving that jobs are available for a significantly
nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id.
"[W]here a claimant suffers from a nonexertional impairment which substantially limits his ability
to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id.
(quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)).

The undersigned finds that the ALJ committed error by not eliciting the testimony of a
vocational expert. The ALJ acknowledged that plaintiff likely suffers from borderline intellectual
functioning. (Tr. 16, 18). As discussed above, the ALJ erred in failing to develop the record
regarding his borderline intellectual functioning and thus formulated an erroneous residual
functional capacity. "[B]orderline intellectual functioning, if supported by the record as it is here,
is a significant nonexertional impairment that must be considered by a vocational expert." Lucy v.
Chater, 113 F.3d 905, 908 (8th Cir. 1997). "While borderline intellectual functioning may not rise

to the level of a disability by itself, a claimant is nevertheless entitled to have a vocational expert consider this condition along with his other impairments to determine how it impacts upon the claimant's residual functional capacity." Id. at 909. The ALJ's finding that plaintiff's mental impairment would not limit his ability to perform the full range of jobs contemplated by the Grids thus "invaded the province of the vocational expert" and was improper. Sanders v. Sullivan, 983 F.2d 822, 824 (8th Cir. 1992).

Additionally, although the pain plaintiff experiences may not, in itself, constitute a disabling condition, it is a non-exertional impairment and is to be considered by a vocational expert. In paragraph 3 of his findings, the ALJ referred to plaintiff's status-post anterior discectomy and fusion at C5-C6. (Tr. 18). This condition causes a certain amount of pain, which is a non-exertional limitation. Plaintiff was entitled to have his pain considered by a vocational expert in his or her testimony concerning the influence of non-exertional limitations on plaintiff's ability to perform jobs in the national economy.

Thus, the undersigned will recommend that this matter be reversed and remanded to the Commissioner in order for the ALJ to adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict his ability to perform jobs in the national economy.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405

(g), the decision of the Commissioner be **reversed** and this case be **remanded** to the

Commissioner for further proceedings consistent with this Report and Recommendation and

further that the court not retain jurisdiction of this matter.


The parties are advised that they have eleven (11) days, until September 4, 2007, in which

to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1),

unless an extension of time for good cause is obtained, and that failure to file timely objections

may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d

356, 357 (8th Cir. 1990).


Dated this ___22nd___ day of August, 2007.

*Lewis M. Blanton*
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE